UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| DOUGLAS W. SCHOLP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No: 3:16-cv-00202-JMS-MPB |
| | ) | |
| CITY OF EVANSVILLE, INDIANA, | ) | |
| OFFICER STEVEN TONEY, in his | ) | |
| individual and official capacities, and | ) | |
| OFFICER KYLE CAMPBELL, in his | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RESPONSE IN**

**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Scott L. Barnhart, #25474-82
Brooke Smith, #32427-03
Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana 46204
(T) 317-857-0160
(F) 855-641-5311
Barnhart@KBindy.com
Smith@KBindy.com

COUNSEL FOR PLAINTIFF

# TABLE OF CONTENTS

Cover ……………………………………………………………………………...1

Table of Contents ……………………………………………………………………2

Table of Authorities ………………………………………………………………3

I. Introduction ……………………………………………………………………5

II. Statement of Material Facts in Dispute …………………………………………...6

III. Summary Judgment Standard ………………………………………………...17

IV. Argument ………………………………………………………………...17

    1. Defendants used excessive force in violation of Mr. Scholp's constitutional rights ………………………………………………………………...17

    2. Defendants are not entitled to qualified immunity on the Plaintiff's excessive force claims …………………………………………………………26

    3. Defendants are liable for failing to protect the Plaintiff …………………………28

    4. Defendants are liable for retaliating against the Plaintiff for asserting his First Amendment rights ………………………………………………..28

    5. Plaintiff's state tort claims are not barred by the Indiana Tort Claims Act …………30

    6. Plaintiff's Assault and Battery claims do not fail as a matter of law ……………….31

    7. Plaintiff's claims for Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Negligence do not fail as a matter of law …...32

    8. The City of Evansville is liable for the violation of the Plaintiff's constitutional rights …………………………………………………………34

V. Conclusion ………………………………………………………………36

Certificate of Service ………………………………………………………………36

# TABLE OF AUTHORITIES

## Cases

*Acevedo v. Canterbury*, 457 F.3d 721 (7th Cir. 2006) …………………………………………18

*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994) ………………………………………………..26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) …………………………………….........17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) …………………………………………………28, 31, 33

*Brosseau v. Haugen*, 543 U.S. 194 (2004) …………………………………………………...27

*Campbell v. Miller*, 499 F.3d 711 (7th Cir. 2007) …………………………………………34

*Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010) ………………………………..17

*DuFour-Dowell v. Cogger*, 969 F.Supp. 1107 (N.D. Ill. 1997) …………………………...26, 27

*Ebeyer v. Rodriguez*, 909 F.Supp.2d 1049 (S.D. Ind. Nov. 15, 2012) …………………………31

*Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993) …………………………………………26

*Evans v. Poskon*, 603 F.3d 362 (7th Cir. 2010) ………………………………………………27

*Graham v. Connor*, 490 U.S. 386 (1989) …………………………………………..............18, 27

*Lanigan v. Will. Of East Hazel Crest, Ill.*, 110 F.3d 467 (7th Cir. 1997) …………………...26, 27

*Lodholtz v. York Risk Services Group, Inc.*, 778 F.3d 635 (7th Cir. 2015) …………...28, 31, 33

*Makowski v. SmithAmundsen LLC*, 662 F.3d 818 (7th Cir. 2011) ………………………………17

*Montano v. City of Chicago*, 535 F.3d 558 (7th Cir. 2008) ……………………………………..34

*Morfin v. City of E. Chicago*, 349 F.3d 989 (7th Cir. 2003) ……………………………………27

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) …………………………………………17, 18, 27

*Phillips v. Community Ins. Corp.*, 678 F.3d 513 (7th Cir. 2012) ……………………22, 24, 26, 27

*Pickrel v. City of Springfield*, 45 F.3d 1115 (7th Cir. 1995) ……………………………………31

*Purvis v. Oest*, 614 F.3d 713 (7th Cir. 2010) …………………………………………………26

*Sere v. Bd. of Trustees of the Univ. of Ill.*, 852 F.2d 285 (7th Cir. 1988) …………………………30

*Tennessee v. Garner*, 471 U.S. 1 (1985) …………………………………………….............27

*Thayer v. Chiczewski*, 705 F.3d 237 (7th Cir. 2012) …………………………………………30

*Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2010) …………………………34

*Thompson v. City of Indianapolis*, 208 F.Supp.3d 968 (S.D. Ind. Sept. 22, 2016) …………….32

*Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693 (7th Cir. 2002) …………………………….....17

*Washington v. Haupert*, 481 F.3d 543 (7th Cir. 2007) …………………………………….........17

*Wilson v. Isaacs*, 929 N.E.2d 200 (Ind. 2010) ……………………………………………….....32

*Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004) ……………………...34

## Other Authority

Fed. R. Civ. P. 8(d) …………………………………………………………………………...30

Fed. R. Civ. P. 56(a) ……………………………………………………………………….........17

Ind. Code § 34-13-3-5 ………………………………………………………………………......30

Ind. Code § 35-41-3-3 ………………………………………………………………………...32

## Introduction

Officer Steven Toney and Kyle Campbell used only their emergency lights during the daylight to stop Douglas Scholp, an individual Officer Campbell described on-scene as a "crippled ass old man," for traveling approximately ten miles per hour over the zoned speed limit, a class C infraction in the State of Indiana.  Mr. Scholp, who had a clearly visible handicap license place, traveled approximately two blocks and pulled into his garage without seeing the officers' lights.  After an initial cordial interaction, Mr. Scholp asked then told the officers to leave his garage and disputed the officers' purpose on his private property.  Officer Toney understood Mr. Scholp's clearly visible cane as an indication that he was disabled, but he ultimately took Mr. Scholp's cane and both officers quickly issued numerous orders to get out of the car, a function they did not know whether Mr. Scholp could perform.  However, the officers then forcibly pulled Mr. Scholp out of his vehicle, taking him to the ground of his garage and used excessive force against him.  That force included Officer Toney delivering ten to fifteen knee strikes to Mr. Scholp's front chest and back torso, which the Plaintiff's expert opined was possibly deadly force, Officer Toney tasing the Plaintiff with a drive stun, Officer Campbell using his closed-fist to strike Mr. Scholp on his left side ten to twenty times, and Officer Campbell tasing Mr. Scholp at least two times with the pronged-cartridge of his taser.

Neither officer attempted to stop the excessive force that was being used against the Plaintiff.  Later both officers laughed and/or chuckled about the incident and Officer Campbell indicated that he "can't go two days without this bullshit."  The facts, taken in the light most favorable to the Plaintiff, demonstrate that the Defendants are not entitled to summary judgment and that this matter should be presented to a jury for a final determination on the genuine issues of material fact.

<h3 style="text-align:center">Statement of Material Facts in Dispute</h3>

Mr. Scholp had a double aortic bypass and two surgeries related to an issue with his left heel (Scholp Depo. p. 33:20-25; 34:1-7). He had trouble walking prior to his surgery and continues to have trouble walking because of lack of circulation to his feet (Scholp Depo. p. 31:6-7; 33:20-25; 35:21-25; 36:1-5; 36:8-11). Mr. Scholp's feet go numb and he feels tingling like fire shooting up to his knee caps (Scholp Depo. p. 36:14-15). Mr. Scholp is on disability and has been unable to work because of the trouble with his feet (Zahn Depo. p. 34:11-22). In 2013, Mr. Scholp was provided permission from his doctor to obtain a handicap license plate for his vehicle (Scholp Depo. p. 34:25-35:1-19). He also uses a cane to get around (Scholp Depo. p. 38:17-25; 39:2). According to Barbara Zahn, Mr. Scholp's significant other, he always uses his cane and he always walks slow (Zahn Depo. p. 39:4-7). Mr. Scholp takes prescribed Gabapentin, a pain medication, for the pain in his feet (Scholp Depo. p. 44:2-5). He typically takes one pill before bed at 9:00 p.m. and another if he wakes up in pain in the night (Scholp Depo. p. 44:12-14). He does not feel any side effects from the medication, it just helps with his feet (Scholp Depo. p. 73:15-24).

On March 26, 2015, Mr. Scholp was fifty-five years old, weighed approximately 180 pounds and was approximately 5'9" tall (Toney Depo. Ex. J, pg. 3). That evening, Mr. Scholp drove to a nearby Dollar General store (Scholp Depo. p. 67:18-22). His handicap license plate was on his vehicle (Scholp Depo. p. 94:17-18). He took his little Yorkie, Banjo, with him in the car and into the store (Scholp Depo. p. 70:9-25). Mr. Scholp had not taken his pain medication for the night (Scholp Depo. p. 72:18-20). Mr. Scholp drove home from the store and was not looking at his speedometer, but was going a comfortable speed (Scholp Depo. p. 84:22:25).

On that day, Officer Steven Toney was approximately thirty-four years old, approximately 6'4" tall, and weighed approximately 275 pounds (Toney Depo. p. 6:6-15). He was equipped with

a .45 caliber Glock 21 handgun, OC spray, an X26 Taser, a pocket knife, two pairs of handcuffs, a radio, and two flashlights (Toney Depo. p. 15:18-19; 22:23-25; 23:1-25; 24:1-11). Officer Toney was on patrol with his partner Officer Kyle Campbell, and a female senior high school student, who was a ride-along that day (Toney Depo. p. 25:2-9). At that time, Officer Campbell was thirty years old, approximately 5'6" tall, and weighed approximately 149 pounds (Campbell Depo. p. 6:2-25). He was equipped with a .45 caliber Glock 21 handgun, an X26 Taser, a pocket knife, and a radio (Campbell Depo. p. 16:8-25; 17:1-18; 36:4-11; 37:1). Officer Campbell was driving the patrol car and Officer Toney was in the front passenger seat (Toney Depo. p. 26:20-21; 29:16-18).

Officer Toney testified that he saw Mr. Scholp drive by "at a high rate of speed," but he did not have a radar gun (Toney Depo. p. 26:15-19). The officers began to follow Mr. Scholp's car, but did not activate their lights (Toney Depo. p. 26:24-25; 27:1-2). By pacing, Officer Toney estimated that Mr. Scholp may have been going over 40 mph in a 30 mph zone (Toney Depo. p. 27:3-15). Officer Campbell acknowledged that pacing is not an exact science and that the officers got a rough estimate of Mr. Scholp's speed (Campbell Depo. p. 23:23-25; 24:1-3). Officer Toney testified that Mr. Scholp stopped at a stop sign, went through the intersection, and then they activated their overhead lights in the daylight (Toney Depo. p. 27:17-25; 28:1-3; 29:14-15). Officer Campbell did not activate his emergency sirens (Campbell Depo. p. 25:10-12). According to Officer Toney, Mr. Scholp continued to drive for approximately two blocks before pulling into a driveway (Toney Depo. p. 28:17-18).

At that point, the sun was still up and it was not dark yet (Toney Depo. p. 29:6-7). Officer Toney was able to read Mr. Scholp's license plate and recognized that it was a disabled plate (Toney Depo. p. 30:6-11; 109:11-19). As the passenger, it was Officer Toney's responsibility to run Mr. Scholp's plate number (Toney Depo. p. 30:12-17). Officer Toney testified that he did not

think he ran Mr. Scholp's license plate at the time, but that he could not recall (Toney Depo. p. 30:8-11). According to Officer Campbell, Mr. Scholp did not display any erratic driving behavior (Campbell Depo. p. 26:3-6). Officer Toney saw Mr. Scholp pull into his driveway, wait for the garage door to open, pull into the garage, and start to close the door behind him (Toney Depo. p. 30:20-22; Google Image 1). Officer Toney knows the area where Mr. Scholp lives to be a safe residential area that is not a high crime or dangerous area (Toney Depo. p. 54:9-18).

Officer Campbell pulled into the driveway and parked (Toney Depo. p. 31:22-24). Because of the officers' position, Mr. Scholp could not have left in his vehicle (Toney Depo. p. 31:25; 32:1-3). Mr. Scholp testified that the first time he saw anything was after he had pulled partway in his garage and he saw things were flashing, blinking (Scholp Depo. p. 78:12-14). He did not see the officers try to pull him over on the street (Officer Video 1, 5:30-6:00; 11:30-11:50). The officers exited the vehicle and walked towards the garage (Toney Depo. p. 33:1-3). Officer Toney did not recall seeing anyone else around (Toney Depo. p. 33:4-5). Neither officer considered or thought about getting a warrant before entering the garage (Toney Depo. p. 33:9-10; Campbell Depo. p. 32:2-3). Officer Campbell did not have his gun drawn as he approached the garage or Mr. Scholp (Campbell Depo. p. 29:6-8). Officer Campbell tripped the sensor at the bottom of the garage door, causing it to open and the officers entered the garage (Toney Depo. p. 32:9-12).

Officer Campbell walked up to Mr. Scholp intending to make a traffic stop (Campbell Depo. p. 29:9-11). Mr. Scholp does not recall who opened the driver's door (Scholp Depo. p. 79:15-18). Officer Campbell asked Mr. Scholp if there was an emergency and if he had to use the bathroom (Scholp Depo. p. 79:1-3; Officer Video 1, 0:01-0:08). At that point, Mr. Scholp had his cane and Banjo in his hands, which were visible to the officers (Officer Video 1, 0:01-0:08). Officer Campbell ordered Mr. Scholp to stay in his vehicle (Officer Video 1, 0:08-0:10). Officer

Campbell then asked Mr. Scholp to give him his identification and Mr. Scholp began to comply (Campbell Depo. p. 31:15-19; Officer Video 1, 0:10-0:12). Mr. Scholp began to shift in his seat, put his hand on the steering wheel, and accidentally hit the horn with his elbow (Officer Video 1, 0:10-0:15). Mr. Scholp then asked Officer Campbell to get out of his garage (Officer Video 1, 0:10-0:19). Mr. Scholp was "pissed off" because he does not let people into his garage and he did not know why the officers were in his garage in the first place (Scholp Depo. p. 88:15-22).

Officer Toney stayed on the passenger side of the vehicle and was looking inside for other passengers and weapons (Toney Depo. p. 33:17-25; 34:1). Officer Toney could see inside the car and did not see any other passengers, any weapons, or anything unusual (Toney Depo. p. 34:5-8; 34:21-25; 35:1-3). Mr. Scholp knew the officers were looking in the car and saw his cane (Scholp Depo. p. 94:14-15). Officer Toney heard Mr. Scholp shouting at Officer Campbell to "get off my property" and Officer Toney went around to see what was going on (Toney Depo. p. 35:14-22).

Once around to the driver's side of the vehicle, Officer Toney saw Mr. Scholp waiving around a cane, but did not ever see Mr. Scholp attempt to strike Officer Campbell with it (Toney Depo. p. 36:6-10). Officer Toney testified that it did not look like Mr. Scholp was pointing at anything with his cane (Toney Depo. p. 133:9-11). When Officer Toney saw Mr. Scholp's cane, that was an indication to him that Mr. Scholp had a disability (Toney Depo. p. 88:4-6). Officer Campbell was not concerned about Mr. Scholp being disabled when he saw the cane (Campbell Depo. p. 34:17-20). Officer Toney heard Mr. Scholp continue to shout at the officers to get off his property and he pulled the cane out of Mr. Scholp's hands (Toney Depo. p. 36:12-21). At that time, Officer Toney did not know if Mr. Scholp needed that cane to walk (Toney Depo. p. 36:22-23). The officers told Mr. Scholp to get out of the car, but Officer Toney did not know if Mr.

Scholp was capable of getting out of the car (Toney Depo. p. 37:1-4). He did not ask Mr. Scholp if he needed the cane to walk and did not think to ask him (Toney Depo. p. 37:5-9).

When Mr. Scholp did not immediately exit the vehicle, both officers gave Mr. Scholp approximately five commands to get out of his vehicle in the span of six seconds (Officer Video 1, 0:28-0:34). Both officers then began to pull him out of his vehicle (Toney Depo. p. 37:12-15). Mr. Scholp honked the horn of the car (Officer Video 1, 0:35-0:40). After he was pulled out of the car, Mr. Scholp, "went to the ground and ended up on his hands and knees" (Toney Depo. p. 38:11-13). According to Officer Toney, Mr. Scholp did not do what the officers asked him to do, but he also did not know if Mr. Scholp could perform those demands (Toney Depo. p. 38:11-16). Mr. Scholp never attempted to swing at the officers, kick the officers, elbow the officers, or headbutt the officers (Toney Depo. p. 38:23-25; 39:1-5). Mr. Scholp never attempted to crawl underneath his car (Zahn Depo. p. 56:10-12; Scholp Depo. p. 113:22-25). Officer Toney does not recall the exact sequence of events, and does not recall what exact orders he gave to Mr. Scholp, but he does recall that at some point he grabbed Mr. Scholp by his arms and legs to get him off all fours, which caused Mr. Scholp to roll onto his back (Toney Depo. p. 39:25; 40:1-3; 44:4-6).

Officer Toney also recalled delivering some knee strikes to Mr. Scholp's upper back and shoulder area (Toney Depo. p. 40:24-25; 41:1-3). In his portion of the Use of Force Report, Officer Toney acknowledged that he delivered several knee strikes to Mr. Scholp's midsection and left shoulder area (Toney Depo. Ex. G, p. 2). He clarified during at deposition that those strikes were in Mr. Scholp's upper body, stomach, and chest area (Toney Depo. p. 88:12-24). According to Mr. Scholp, Officer Toney kneed him approximately ten to fifteen times (Scholp Depo. p. 100:10-24). Officer Toney testified that Mr. Scholp's resistance consisted of Mr. Scholp tensing his muscles, Mr. Scholp not following commands, and the officers' inability to get Mr. Scholp's hands

behind his back for handcuffing (Toney Depo. p. 41:16-20). According to Officer Toney, Mr. Scholp only began resisting the officers "after [Officer Toney] took the cane and we told him to get out of the car, and from then he started actively resisting." (Toney Depo. p. 80:18-24). However, Officer Toney later testified that he considered passive resistance as "more tensing of the muscles, refusing to physically obey commands" (Toney Depo. p. 92:2-7). While interacting with Mr. Scholp, Officer Toney was not concerned that he was hurting Mr. Scholp (Toney Depo. p. 45:16-19).

Officer Campbell began hitting Mr. Scholp in his upper left back side with ten to twenty short hard closed-fist strokes, driving Mr. Scholp down on the ground (Scholp Depo. p. 97:3-13; 98:3-11). Officer Campbell testified that he deployed hard strikes to Mr. Scholp's left side (Campbell Depo. p. 35:18-23). Officer Campbell did not recall any point where Mr. Scholp kicked him, elbowed him, or headbutted him (Campbell Depo. p. 43:7-14). Officer Campbell testified that Mr. Scholp's acts of bracing himself inside the vehicle, refusing to give his hands, and not complying was the extent of Mr. Scholp's resisting (Campbell Depo. p. 51:6-14).

Officer Toney also recalled that he drive stunned Mr. Scholp with his taser in his front mid-section (Toney Depo. p. 40:4-7; 91:1-4). Officer Toney does not recall exactly how many cycles he ran through Mr. Scholp (Toney Depo. p. 40:20-23). Officer Toney also did not recall whether he gave a taser warning to Mr. Scholp (Toney Depo. p. 44:1-3). Officer Toney testified at his deposition that a drive stun is more for pain compliance (Toney Depo. p. 90:21-23). Officer Toney also testified during his deposition that getting tased, "hurt. I mean, everything, all your muscles lock up and you can't move." (Toney Depo. p. 17:14-16). When asked at his deposition whether an officer should give a subject reasonable time to comply before using a taser, Officer Toney

testified that it depends on the situation (Toney Depo. p. 101:11-14). Officer Toney agreed that being tased affects both physical and psychological faculties (Toney Depo. p. 103:22-25).

Officer Campbell tased Mr. Scholp using the pronged-cartridge function of his taser (Campbell Depo. p. 37:36:19-20). At that time he deployed the taser, Officer Campbell was standing directly over Mr. Scholp and the taser was only a few feet away from him (Campbell Depo. p. 37:13-20). Officer Campbell testified that he was intending to get Mr. Scholp into handcuffs and "used the taser to help get him into that position." (Campbell Depo. p. 39:6-9). He did not know what effect the taser had on Mr. Scholp (Campbell Depo. p. 39:11-12). Officer Campbell did not recall giving a taser warning before deploying his taser (Campbell Depo. p. 40:15-22). Officer Campbell testified that he had been tased during his training and he recalled that it locked up his body (Campbell Depo. p. 68:14-15). When asked at his deposition whether he believed a taser should be used within the law and within department policy and training, Officer Campbell testified that "it feels situational" (Campbell Depo. p. 73:13-20). When asked at his deposition whether an individual should be given a reasonable opportunity to comply before a taser is used, Officer Campbell testified that it is situational (Campbell Depo. p. 74:13-17).

Mr. Scholp felt the effects of the taser tense his muscles and he felt glued to the floor (Scholp Depo. p. 80:17-25). Mr. Scholp heard the officers yell at him to give them his hands, but because of the effects of the taser, he could not give them his hands (Scholp Depo. p. 80:7-25; 101:12-17). He was not given enough time between tasings to recover or give his hands to the officers (Scholp Depo. p. 107:24-25-108:1-8). Mr. Scholp felt the tasings were for punishment than because the officers thought he was resisting (Scholp Depo. p. 108:21-25-109:1). While the officers never directly said they were punishing him, Mr. Scholp believed it was punishment based on their attitudes (Scholp Depo. p. 111:10-12). In his deposition he testified:

> How could I be compliant? So, yes, I feel like I was being punished being zapped before I could give them my hands. They yanked me out of the car - - the next thing, 'Give me your hands. Give me your hands.' Well, heck, you just got yanked out of a car. Things are going so fast, get bounced on the ground, and then the next thing you know, 'Give me your hands.' I'm zapped. I'm already zapped. Yes, I feel like I was punished.

(Scholp Depo. p. 110:10-18).

Barbara, who was sixty-two years old at the time, heard a horn honking and went outside (Zahn Depo. p. 49:17; 50:10-12). She saw lights flashing and saw Mr. Scholp's cane flying out of the garage (Zahn Depo. p. 50:12-18; 55:11-13). Barbara knew that you are not supposed to go up on an officer when they are on duty, so she made sure to keep her space (Zahn Depo. p. 53:22). Barbara never entered the garage (Officer Video 1, 3:22). Barbara yelled at the officers to stop hitting Mr. Scholp because he has just had bypass surgery and that they were killing him (Zahn Depo. p. 50:20-23). Mr. Scholp could hear Barbara yelling, "You're going to kill him" to the officers (Scholp Depo. p. 123:3-5). Barbara also indicated to the officers that Mr. Scholp was handicapped (Toney Depo. p. 136:3-12; Campbell Depo. p. 81:7-8). However, according to Barbara, the officers just kept "thumping him in the side." (Zahn Depo. p. 50:22-24). She could hear Mr. Scholp crying and moaning in pain (Zahn Depo. p. 57:23-24). Barbara heard the tasers and asked the officers what right they had to be in the garage (Zahn Depo. p. 50:25; 51:1-4).

After Mr. Scholp was handcuffed, another officer came on-scene, handcuffed Barbara and put her in a chair (Zahn Depo. p. 51:4-8; Officer Video 1, 2:30-3:30; 4:00-4:30). The body camera footage shows the officer telling Barbara that she was handcuffed because "you're not just going to sit there and yell at me about it, I can tell you that much right now." (Officer Video 2, 0:15-0:30). Barbara spent about five minutes in handcuffs before being released (Officer Video 2, 5:10-5:30).

Mr. Scholp's chest and stomach began to hurt (Scholp Depo. p. 81:2-4). He was "hurting bad" at that point (Scholp Depo. p. 102:15-16). After Mr. Scholp was handcuffed, but still inside the garage, he was crying and moaning in pain (Officer Video 1, 3:30-4:00). Officer Campbell told Mr. Scholp, "Hey, I'm trying to get you an ambulance, but they're not going to hear you (sic) because you won't shut the fuck up." (Officer Video 1, 3:50-4:00). Mr. Scholp was left on the floor of the garage for approximately three minutes after he was handcuffed until the officers moved him (Officer Video 1, 2:00-5:11). Officer Toney handcuffed Mr. Scholp, and later pulled him up, and sat him down outside the garage (Scholp Depo. p. 102:11-16; Toney Depo. p. 44:14-15). Barbara testified that the officers, "were dragging him to the end of the garage." (Zahn Depo. p. 52:9-11). Officer Toney testified that Mr. Scholp complained of check pain "at some point" after he was handcuffed (Toney Depo. p. 45:13-15; 63:11-13). Officer Toney does not recall whether he checked the cuffs for fitness, but does recall that he did not check that the cuffs were double locked initially (Toney Depo. p. 44:18-23).

Approximately eight minutes after he was handcuffed, Mr. Scholp complained to Officer Campbell about one of his cuffs being too tight and hurting a nerve (Officer Video 1, 12:17-13:45). Officer Toney did not recall looking for any injuries on Mr. Scholp, looking at Mr. Scholp's chest area, looking at the taser marks, or even who removed the taser probes from Mr. Scholp (Toney Depo. p. 46:1-9). Neither Officer Toney nor Officer Campbell were injured during their interactions with Mr. Scholp (Toney Depo. p. 80:11-14; Campbell Depo. p. 59:1-3). Officer Toney never suspected that Mr. Scholp was driving drunk or driving under the influence of drugs (Toney Depo. p. 59:12-18).

The officers then began to search Mr. Scholp's vehicle without a warrant (Officer Video 1, 6:30-6:40). While searching the vehicle, Officer Campbell said to Officer Toney, "why, dude?

I don't fucking get it? I can't go two days without this bullshit" (Officer Video 1, 6:32-6:45). The officers then began laughing and/or chuckling to each other and Officer Campbell said, "crippled ass old man...wouldn't give it up" (Officer Video 1, 6:45-7:00). While outside the garage, Mr. Scholp heard one of the officers call him, "crippled old man" (Scholp Depo. p. 120:5-9). Officer Campbell conceded during his deposition that he called Mr. Scholp a "crippled ass old man," but did not know why he said it (Campbell Depo. p. 88:1-5).

Officer Josh Doane and Sergeant James Myers, who was the supervisor, arrived on scene (Toney Depo. p. 47:5-8; 57:9-12). EMTs also arrived, but Officer Toney did not recall what they did to Mr. Scholp (Toney Depo. p. 49:15-20). Afterwards, Mr. Scholp was put in an ambulance and taken to St. Mary's Hospital (Toney Depo. p. 49:21-23; Scholp Depo. p. 125:13-15). There, Mr. Scholp was diagnosed with a "chest wall contusion" (Toney Depo. p. 89:3-11; Ex. G). Mr. Scholp was ultimately released from the hospital and was transported to the Vanderburgh County Jail by the officers (Toney Depo. p. 50:2-25; 51:1).

While on-scene, Officer Toney was aware that the ride-along had recorded something (Toney Depo. p. 42:21-22). Officer Campbell's body camera captured a conversation where Officer Toney suggested they "talk to her to make sure it don't end up on social media or anywhere" (Officer Video 1, 18:40-18:55). Later, Mr. Scholp heard one of the officers tell the ride-along that she should get rid of any video she took or that she needed to get it erased (Scholp Depo. p. 82:19-25; 118:21-25; 119:1-3). Officer Toney acknowledged during his deposition that it is their standard practice to turn off their body cameras when just officers are discussing things (Toney Depo. p. 113:2-12). Officer Campbell confirmed the same (Campbell Depo. p. 55:3-12).

Mr. Scholp was ultimately charged with resisting law enforcement, as a class A misdemeanor, disorderly conduct, as a class B misdemeanor, criminal mischief, as a class B

misdemeanor, and speeding, as a class C infraction (Toney Depo. Ex. C). Officer Toney completed a Probable Cause Affidavit submitted to the prosecutor, but did not include information about his taser use or physical force because "that was part of a separate report" and did not include information that the incident was caught on his body camera (Toney Depo. p. 63:22-25; 64:1-2; 64:22-25; 65:1-4; Ex. D). Mr. Scholp's criminal matter went to jury trial on July 28, 2016 (CCS). Mr. Scholp was found not guilty of resisting law enforcement, disorderly conduct, and criminal mischief (CCS). He was found guilty of speeding, as a class C infraction (CCS).

The day after his arrest, Barbara took photos of Mr. Scholp's burns caused by the tasers (Zahn Depo. p. 67:7-24; Ex. D). Mr. Scholp testified at his depositions that the officers did not know how to "chill down" the situation and that they were "hyped up" (Scholp Depo. p. 116:8-12). He did not know if they were trying to show off in front of the girl in their car or because there were two of them with one starting to do something and the other following suit (Scholp Depo. p. 116:21-25; 117:1-5).

The Plaintiff retained Captain Anthony Gregory to produce an expert report in this matter (Gregory Report). Capt. Gregory concluded that:

> It is disturbing that the Supervisory report filed by J.W. Myers found that the "Force used by both officers was justified and reasonable and no further administrative action is recommended." Quite to the contrary, at almost every point in this encounter, the officers' use of force was unreasonable and excessive. Moreover, at no point did either officer appear to "put on the breaks" and attempt to stop himself or the other officer from continuing the use of force. Rather, they both appeared to take cues from the other in escalating the situation. One can never say for certain how things would have played out if people had acted differently, but it seems likely that this entire situation could have (and should have) been resolved without any use of force whatsoever.

(Gregory Report, p. 10).

**Standard of Review**

Summary judgment should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in his favor. *Makowski v. SmithAmundsen LLC,* 662 F.3d 818, 822 (7th Cir. 2011). "The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002).

A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Washington*, 481 F.3d at 550. The Seventh Circuit has recognized that, "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible to different interpretations[.]"*Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

**Argument**

**1. Defendants used excessive force in violation of Mr. Scholp's constitutional rights.**

Defendant's uses of physical force against the Plaintiff were excessive and above that required to effectuate the Plaintiff's arrest. Claims that officers used excessive force in seizing a

person are evaluated under the Fourth Amendment's reasonableness standard. *See Acevedo v. Canterbury,* 457 F.3d 721, 724 (7th Cir. 2006). The critical question is whether, in light of the facts and circumstances that confronted the officer, the officer behaved in an "objectively reasonable" manner. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

A "police officer's use of force is unconstitutional if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Payne*, 337 F.3d at 778. A review of the totality of the circumstances requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Injury is not an element of an excessive-force claim, but is evidence of the degree of force imposed and the reasonableness of that force. *Id.*

The Defendants' assert that the Plaintiff's language, tone of voice, use of his cane, bracing movements inside his car, and passive resistance while on the ground necessitated the Officers' uses of force against the Plaintiff (D.E. 49, p. 12, 14; Toney Depo. p. 21: 1-7; 38:23-25; 39:1-5; 41:16-20; Campbell Depo. p. 43:7-14). However, the facts that form the basis for those assertions, taken in the light most favorable to the Plaintiff, do not justify any of the officers' uses of physical force as objectively reasonable. Those uses of force include the officers pulling Mr. Scholp out of his vehicle and taking him to the floor of his garage on all fours, Officer Toney delivering ten to fifteen knee strikes to Mr. Scholp's front chest and back torso, Officer Toney drive stunning the Plaintiff, Officer Campbell using his closed-fist to strike Mr. Scholp on his left side ten to twenty

times, and Officer Campbell shooting Mr. Scholp with the pronged-cartridge of his taser while standing directly over Mr. Scholp and running at least two cycles through him (Toney Depo. p. 37:12-15; 38:11-13; 39:25; 40:1-7; 40:20-25; 41:1-3; 43:6-13; 44:4-6; 88:12-24; 91:1-4; Ex. G, p. 2; Scholp Depo. p. 97:3-13; 98:3-11; 100:10-24; Campbell Depo. p. 35:18-23; 36:19-20; 27:13-20; 39:6-9).

Looking to the totality of the circumstances, a reasonable officer on the scene would have known the following at the time the Defendants initiated force against the Plaintiff:

- After pacing the Plaintiff's vehicle, the Plaintiff appeared to be going 40 mph in a 30 mph zone (Toney Depo. p. 27:3-25);
- Speeding is considered a class C infraction in the State of Indiana (Charging Information; Indiana Code § 9-21-5-2);
- The officers activated their emergency lights, but no sirens, on the street to conduct a traffic stop related to the alleged speeding (Toney Depo. p. 28:1-3; 29:14-15; Campbell Depo. p. 25:10-12);
- The sun was up and it was not dark outside (Toney Depo. p. 29:6-7);
- While the Plaintiff did not respond to the lights, he did not drive or act furtively or erratically (Campbell Depo. p. 26:3-20);
- The Plaintiff had a handicapped license plate on his vehicle (Toney Depo. p. 30:6-11; 109:11-19);
- They were located in a safe residential area that is not a high crime or dangerous area (Toney Depo. p. 54:9-18);
- After approaching the Plaintiff in his garage, the Plaintiff had a cane and small dog clearly visible in his hands (Officer Video 1, 0:01-0:08);
- Officers did not see any other passengers, weapons, or anything unusual in the Plaintiff's vehicle (Toney Depo. p. 34:5-8; 34:21-25; 35:1-3);
- The Plaintiff was ordered to stay in his car and did so (Officer Video 1, 0:08-0:10);
- The Plaintiff was initially cordial and compliant with the officers (Campbell Depo. p. 31:15-19; Officer Video 1, 0:01-0:18);
- The Plaintiff respectfully asked the officers to leave his garage (Officer Video 1, 0:01-0:18);
- The Plaintiff put his cane out his door, but he did not attempt to hit either officer and did not appear to be pointing at anything (Toney Depo. p. 36:6-10; 133:9-11);
- At the same moment the Plaintiff's cane was removed from him, the officers ordered the Plaintiff to get out of his vehicle for the first time (Officer Video 1, 0:28); and
- Over the next six seconds the two officers issued a total of five orders to get out of his vehicle (Officer Video 1, 0:28-0:34).

A reasonable officer could conclude they had sufficient probable cause to stop the Plaintiff for a class C traffic infraction.[1]  However, because of the daylight, the lack of emergency sirens, and the Plaintiff's non-erratic behavior, it was not reasonable for the officers to believe that the Plaintiff was aware that they had attempted to execute a traffic stop or that the Plaintiff knew why the officers were in his garage.  Given the totality of the circumstances, it was not reasonable for them to believe that he was acting threateningly towards them when the Plaintiff asked and told the officers to get out of his garage.  The Plaintiff's expert, Captain Anthony Gregory, concluded in his expert report that the Plaintiff's actions were normal in light of the facts and circumstances (Gregory Report p. 4-7).  A reasonable officer would have concluded that the Plaintiff was merely confused about why an officer was suddenly in his garage and taken steps to explain the situation.

Leading up to the officers' use of force, the Plaintiff did not make any threats to the Defendants and he was not yelling or shouting menacingly at the officers (Officer Video 1, 0:01-0:33).  Officer Campbell's body camera video shows that Mr. Scholp was not pointing his cane at Officer Campbell and Officer Toney testified that he never saw Mr. Scholp attempt to hit Officer Campbell with the cane and that it did not look like Mr. Scholp was pointing at anything (Officer Video 1, 0:25-0:30; Toney Depo. p. 36:6-10).  On the issue of Mr. Scholp's cane, Capt. Gregory opined that:

> [i]t is important to point up at this juncture that Mr. Scholp did not credibly threaten anyone with his cane…We teach officers that you cannot use force based merely on what someone 'could' or 'might' do…A reasonable person needs to perceive an imminent threat before using force.  This means that at come level the force has to be 'probable', not merely 'possible'.

(Gregory Report, p. 6-7).

---

[1] The Plaintiff was ultimately found guilty by a jury of committing Speeding, as a class C infraction (CCS).

Accordingly, a reasonable officer could not have reasonably believed that the Plaintiff's use of his cane put them in imminent harm. Importantly, Mr. Scholp's cane was only outside his car for approximately five seconds before Officer Toney grabbed it from him (Officer Video 1, 0:25-0:30). Once the cane was removed from the Plaintiff any alleged imminent harm the officers were in was removed. The officers do not allege, and the video does not dispute, that Mr. Scholp did not make any threatening gestures towards the officers or reached out of the sight of the officers after his cane was pulled away from him, but before the officers pulled him out of the vehicle (Officer Video 1, 0:25-0:35).

At the same time the Plaintiff's cane was removed from him, the officers ordered Mr. Scholp to get out of his vehicle for the first time[2] and without knowing whether Mr. Scholp could comply (Officer Video 1, 0:28). Within six seconds the two officers issued a total of five orders to the Plaintiff to get out of his vehicle (Officer Video 1, 0:28-0:34). During that time, Mr. Scholp indicated, "that was my cane" in a manner Capt. Gregory considered to be "concerned" (Officer Video 1, 0:25-0:32; Gregory Report, p. 6). Officer Toney recognized that the Plaintiff's cane was an indication that he was disabled and both officers were or should have been aware the Plaintiff had a handicap license plate (Toney Depo. p. 88:4-6; 30:6-11; 109:11-19). Officer Toney even acknowledged in his deposition testimony that he did not know if the Plaintiff was capable of getting out of his car (Toney Depo. p. 37:1-4). However, despite Mr. Scholp clearly being elderly and disabled, neither officer attempted to assist or accommodate Mr. Scholp with getting out of his vehicle, offered to assist or accommodate Mr. Scholp with getting out of his vehicle, gave Mr. Scholp commands with which they knew he could comply, or even gave Mr. Scholp orders that

---

[2]This order is in direct conflict with Officer Campbell's previous order for the Plaintiff to stay in his car (Officer Video 1, 0:08-0:10).

did not conflict with their previous order to stay in his car. According to Capt. Gregory, a reasonable officer would have understood Mr. Scholp to either be "playing 'mental catch up'" or that Mr. Scholp may not have easily complied with the officers' demands because they had taken his cane away from him (Gregory Report p. 7).

The Seventh Circuit has recognized that "[i]t is not objectively reasonable to ignore specific facts as they develop (which contradict the need for this amount of force), in favor of prior general information about a suspect." *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 523 (7th Cir. 2012). Here, as the officers followed and interacted with the Plaintiff, they were presented with various facts that should have caused them to alter or mitigate the orders and force they used against him. The officers knew or reasonably should have known that the Plaintiff was in some way handicapped or disabled before they encountered him in his garage because of his license plate. Once they approached the Plaintiff, he clearly and obviously had a cane, which a reasonable officer would have perceived as an indicator that the Plaintiff had trouble walking or moving. Despite those facts, within six seconds of their first order to get out of the car the Defendants quickly barraged the Plaintiff with four additional orders, not knowing if he was capable of getting out of his car. Then when he could not comply, the officers forcibly pulled the Plaintiff out of his car and threw him to the ground. Both officers appeared to ignore obvious facts as they developed and persisted in ordering the Plaintiff to perform a function that they did not know he could perform and reasonably should have known would likely be difficult for him to perform quickly.

For the sake of argument, even if the officers initially had an objectively reasonable purpose for placing their hands on Mr. Scholp, which they did not, that purpose cannot extend into perpetuity after the officers were presented with facts that clearly indicated that the Plaintiff was

handicapped or disabled.  Simply, the officers used greater force than was reasonably necessary and their initial uses of force against the Plaintiff were excessive.

After pulling the Plaintiff out of the car, the officers allege that Mr. Scholp landed on his hands and knees (Toney Depo. p. 38:11-13).  Once on the ground, approximately five seconds pass where the officers do not give Mr. Scholp any order or direction (Officer Video 1, 0:35-0:45).  Mr. Scholp is then ordered to "get on the ground" (Officer Video 1, 0:43-45).  Officer Toney testified that he pulled Mr. Scholp by his arms and legs to get him off all fours, which caused Mr. Scholp to roll onto his back (Toney Depo. p. 39:25; 40:1-3; 44:4-6).  Approximately ten seconds later, one of the officers ordered Mr. Scholp to put his hands behind his back (Officer Video 1, 0:53-0:54).  Eight seconds later the officers issued another order for Mr. Scholp to put his hands behind his back (Officer Video 1, 0:52-0:55).  Thirteen seconds later the officers issued a third order for Mr. Scholp to get his hands behind his back (Officer Video 1, 1:12-1:14).

Eight seconds later, Officer Campbell uses the probe function of his taser to tase Mr. Scholp (Officer Video 1, 1:21).  The unique sound produced by a taser can be heard cycling for approximately seven seconds (Officer Video 1, 1:21-1:30).  Seventeen seconds later a five second taser cycle can be heard (Officer Video 1, 1:38-1:44).  Twelve seconds later a three second taser cycle can be heard (Officer Video 1, 1:50-1:54).  While not clear from the video, in addition to the three tasings, Plaintiff asserts that Officer Toney delivered ten to fifteen knee strikes to his front chest and back torso and that Officer Campbell used his closed-fist to strike him on his left side ten to twenty times (Scholp Depo. p. 97:3-13; 98:3-11; 100:10-24).  Officer Toney acknowledged that he struck the Plaintiff in his upper back and shoulder, midsection, upper body, stomach, and chest (Toney Depo. p. 40:24-25; 41:1-3; 88:12-24; Ex. G, p. 2).  Officer Campbell acknowledged that he struck the Plaintiff on his left side (Campbell Depo. p. 35:18-23).

The Seventh Circuit has held that force becomes "increasingly severe the more often it is used; striking a resisting subject once is not the same as striking him ten times" *Phillips*, 678 F.3d at 529. "There is a commonsense need to mitigate force when apprehending a non-resisting suspect, particularly when the suspect is known to have diminished capacity. An arrestee may be physically unable to comply with police commands." *Id.* at 526 . That case further held that there are "definite limits to the force officers may use to prod arrestees into obeying commands. A rule that pins reasonableness on whether officers used the force necessary to secure compliance would be a rule that requires officers to beat non-resisting arrestees into submission." *Id.* at 527. However, that is what the Defendants here appear to have done.

By the time Mr. Scholp was pulled from his car, the officers had taken away the Plaintiff's cane, the only "weapon" he was alleged to have possessed (Officer Video 1, 0:25-0:30). Throughout the incident, both officers were on top of or very close to the Plaintiff and neither testified or asserted that he was reaching for or attempting to obtain any other weapon (Officer Video 1, 0:40-2:03). Importantly, both officers acknowledged that the Plaintiff did not attempt to swing, kick, elbow, or headbutt the officers and that the Plaintiff's only acts of resistance included allegedly tensing his muscles, not following commands, and not surrendering his hands for cuffing (Toney Depo. p. 38:23-25; 39:1-5; 41:16-20; Campbell Depo. p. 43:7-14). Officer Toney testified that, "[p]assive resistance would be more tensing of the muscles, refusing to physically obey commands, would be more passive." (Toney Depo. p. 21:1-7). At no time did the Plaintiff attempt to crawl underneath his car nor was it reasonable for the officers to believe that he was (Zahn Depo. p. 56:10-12; Scholp Depo. p. 113:22-25).

During their depositions, both officers testified concerning the muscular incapacitation caused by a taser. (Toney Depo. p. 90:21-23; 103:22-25; Campbell Depo. p. 68:14-15). Officer

Toney specifically stated that being tased, "hurt. I mean, everything, all your muscles lock up and you can't move." (Toney Depo. p. 17:14-16). Officer Toney also testified that being tased affects both physical and psychological faculties (Toney Depo. p. 103:22-25). Officer Campbell testified that being tased locked up his body (Campbell Depo. p. 68:14-15). The Plaintiff testified that he felt the effects of the tasings tense his muscles and he felt glued to the floor (Scholp Depo. p. 80:17-25). Mr. Scholp indicated that he could not comply with the officers' orders because his muscles were tense from the officers' actions and because he was not given sufficient time between their orders to comply (Scholp Depo. p. 80:7-25; 107:24-25; 108:1-8).

However, despite Mr. Scholp's passive resistance and the reasonable inference that he had diminished capacity, was under the effects of their uses of force, and he was unable to comply with their orders, the officers proceeded to use what Capt. Gregory categorized as potentially deadly force and three separate taser deployments against Mr. Scholp to beat him into submission. Capt. Gregory specifically stated that:

> [k]nee strikes are perhaps the most powerful blow a human can deliver without a weapon. We teach knee strikes principally for use against the common peroneal motor nerve point on the outside of the thigh, or in limited circumstances against the soft tissue of the lower abdomen. To use a knee strike against the side of the torso of a person down on hands and knees is an invitation to break ribs, and very possibly puncture internal organs…Knee strikes against the side of a person's torso are not a use of force we teach, except in a situation where deadly force would be justified.

(Gregory Report, p. 8).

The Defendants have not stated and there is no justification for using deadly force against Mr. Scholp, who was elderly, clearly disabled, and who was simply unable to comply with the Defendants' orders. As a result, the officers' uses of force against the Plaintiff while he was on the ground were not objectively reasonable and were therefore excessive.

In total, it was not reasonable for the Defendants to believe that the Plaintiff knew they had attempted to complete a traffic stop. Also, it was not reasonable for Defendants to believe the Plaintiff's use of his cane, movements inside the car, and passive resistance on the ground justified three taser deployments and multiple substantial uses of physical force. Finally, the situation was not reasonably dangerous for the Defendants to use the escalated amount of force that they did in effectuating the Plaintiff's arrest. The Defendants' uses of force were not objectively reasonable and they are liable for their uses of excessive force. A reasonable jury could conclude that the Defendant's uses of force were excessive.

## 2. Defendants are not entitled to Qualified Immunity on the Plaintiff's Excessive force claims.

The Defendants seek refuge through the doctrine of qualified immunity (D.E. 49, p. 18-21). There is a two-part test to determine whether the qualified immunity doctrine attaches: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010). "[A] case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Phillips*, 678 F.3d at 528. When the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury, summary judgment is not appropriate. *See Estate of Starks v. Enyart*, 5 F.3d 230, 234-235 (7th Cir. 1993); *see also Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir. 1994). Above, the Plaintiff demonstrated that the Defendants used excessive force in executing his arrest.

There was clearly established law at the time that gave the Defendants fair notice that their actions in using substantial force against a passively resisting arrestee. It is well established that "[e]ven 'one violent push and poke' will constitute excessive force when there is no provocation."

*DuFour–Dowell v. Cogger,* 969 F.Supp. 1107, 1120 (N.D. Ill. 1997) (quoting *Lanigan v. Vill. of East Hazel Crest, Ill.,* 110 F.3d 467, 475 (7th Cir. 1997)).  *See also Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010).  Additionally, the Seventh Circuit has asserted that it is clearly established that officers could not use significant force against a non-resisting or passively resisting individual. *See Phillips*, 678 F.3d at 529; *Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003); *Payne*, 337 F.3d at 779.  The record in this case, taken in the light most favorable to the Plaintiff, supports the inference that the Plaintiff was passively resisting (Toney Depo. p. 38:23-25; 39:1-5; 41:16-20; Campbell Depo. p. 43:7-14).  The Plaintiff did not attempt to hit or strike the Defendants; he was allegedly and simply failing to immediately comply with the officers' orders and was tensing his muscles as a result of their own actions (Toney Depo. p. 38:23-25; 39:1-5; 41:16-20; Campbell Depo. p. 43:7-14).  At the time of the incident, it was clearly established that it was unreasonable for officers to respond to his passive resistance with significant force and here it was unreasonable for the officers to believe that Mr. Scholp was actively resisting their arrest.

Further, "in an obvious case" the general objective standards of reasonableness outlined in *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham,* can "clearly establish" violation of the Fourth Amendment, even without a body of relevant case law.  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). There is no dispute that it is unreasonable for police officers to use excessive force to detain an individual or to seize an "unarmed, nondangerous suspect by shooting him dead." *Tennessee,* 471 U.S. at 11.  Similarly, there can be no dispute that the Defendants acted unreasonably in light of the facts taken in a light most favorable to the Plaintiff.  It was unreasonable for the Defendants to pull a disabled man out of his vehicle and take him to the floor of his garage on all fours, Officer Toney to deliver ten to fifteen knee strikes to Mr. Scholp's front chest and back torso, Officer Toney to drive stun the Plaintiff, Officer Campbell to use his closed-

fist to strike Mr. Scholp on his left side ten to twenty times, and for Officer Campbell to shoot Mr. Scholp with the pronged-cartridge of his taser while standing directly over Mr. Scholp and running at least two cycles through him. This case presents an obvious case where the standards of reasonableness clearly establish a violation of the Fourth Amendment even assuming for purposes of argument that a body of relevant case law does not exist, which it does.

### 3. Defendants are liable for failing to protect the Plaintiff.

The Defendants assert that the Plaintiff's "failure to protect claim rises and falls on the merits of the excessive force claim" and do not make any substantive argument regarding the Plaintiff's failure to protect claims (D.E. 49, p. 21). As argued above, the Defendants did engage in excessive force against the Plaintiff. As a result, they are liable for failing to protect the Plaintiff.

### 4. Defendants are liable for retaliating against the Plaintiff for asserting his First Amendment rights.

The Plaintiff's Complaint raised a facially plausible First Amendment Claim that allowed the Court and the Defendants to draw a reasonable inference that the Defendants are liable for their retaliation after Mr. Scholp questioned the officers' actions and told them to leave his garage. *See Lodholtz v. York Risk Services Group, Inc.,* 778 F.3d 635, 639 (7th Cir. 2015) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). Specifically, the Plaintiff's complaint alleges that "[t]he Plaintiff was exercising his rights protected under the First and Fourteenth Amendments when he *spoke* with Officers Toney and Campbell." (D.E. 1-1, p. 6) (emphasis added). Paragraph 25 of the Plaintiff's Factual Background specifically asserts that, "Plaintiff told the officers to get out of his garage so that he could exit the vehicle." (D.E. 1-1, p. 3). That paragraph is the only paragraph in the Plaintiff's Complaint that alleges any conversation between the Plaintiff and the Defendants. After asserting the Plaintiff told the officers to get out of his garage, the Plaintiff's Complaint outlines the actions and physical force used against the Plaintiff (D.E. 1-1, p. 3). As a result, the

Defendants had sufficient notice regarding which misconduct the Plaintiff alleged violated his First Amendment rights.

In their brief, the Defendants ignore the Complaint's well-pleaded facts and reasonable inferences drawn therefrom, and instead focus on the Defendants' actions after the Plaintiff was handcuffed. However, as asserted above, it is clear the Plaintiff's First Amendment claims are based in the Defendants' retaliatory conduct prior to the Plaintiff being handcuffed. Officer Campbell's body camera video is clear that the interactions between Officer Campbell and Mr. Scholp are cordial and polite from the outset and Officer Campbell issued an order to the Plaintiff to stay in his vehicle. (Officer Video 1, 0:01-0:10). Officer Campbell then asked Mr. Scholp to give him his identification and that Mr. Scholp began to comply (Campbell Depo. p. 31:15-19; Officer Video 1, 0:10-0:12). However, when Mr. Scholp asked Officer Campbell to get out of his garage and disputed the officers' reason for being in his garage, Officer Campbell and Officer Toney began to escalate the situation against the Plaintiff (Officer Video 1, 0:10-0:31). The officers' tone changed, they took Mr. Scholp's cane at the same time they began issuing five orders within approximately six seconds for Mr. Scholp to get out of his vehicle, and the officers physically removed Mr. Scholp from his vehicle onto the ground, where he was hit, kneed, and tased multiple times before being handcuffed (Officer Video 1, 0:20-2:31). Additionally, after the Plaintiff was placed in handcuffs, Officer Campbell called Mr. Scholp a "crippled ass old man" and chuckled (Officer Video 1, 6:45-7:00).

The Defendants verbally responded and physically attacked Mr. Scholp in retaliation after he attempted to assert his constitutional right to be free from an unreasonable search and seizure. A reasonable jury could infer from those facts taken in the light most favorable to the Plaintiff that Mr. Scholp engaged in protected speech when he spoke with the Defendants, he suffered retaliation

as a result of that speech, which came in the form of the use of both verbal assault and punishing and excessive force against him, that would likely deter First Amendment activity in the future, and that the officers were motivated to take retaliatory action against the Plaintiff because of his speech. *See Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012). However, the Defendants did not raise any argument related to the Plaintiff's First Amendment claim as raised in his Complaint. As a result, the Defendants have waived the issue for summary judgment. *See Sere v. Bd. of Trustees of the Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir. 1988).

**5. Plaintiff's state tort claims are not barred by the Indiana Tort Claims Act.**

The Plaintiff's Complaint raises Count VI: Assault, Count VII: Battery, Count VIII: Intentional Infliction of Emotional Distress, X: Negligent Infliction of Emotional Distress, and Count XI: Negligence against Officers Campbell and Toney in their individual and/or official capacities (D.E. 1-1, p. 8-11). Pursuant to Rule 8(d)(2) and (3) of the Federal Rules of Civil Procedure, the Plaintiff may raise alternative and/or inconsistent statements of claims against the Defendants. Further, immunity under the Indiana Tort Claims Act does not extend to employees whose action is "(1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful or wanton; or (5) calculated to benefit the employee personally." Indiana Code § 34-13-3-5(c).

In their brief, the Defendants assert that the Plaintiff's claims are barred by the Indiana Tort Claims Act because, while the Plaintiff has sued the officers in their individual capacities, in the "Parties" section of the Plaintiff's Complaint he asserts that each officer was, "at all relevant times referenced herein, was employed as a law enforcement officer with the EPD" (D.E. 49, p. 28). However, the Defendants improperly conflate the Plaintiff's assertion that the officers were employed as law enforcement officers with a concession that the officers were acting within the

scope of their employment. In fact, "acting outside the scope of one's employment is not mutually exclusive with acting under the color of state law." *Ebeyer v. Rodriguez*, 909 F.Supp.2d 1049, 1058 (S.D. Ind. Nov. 15, 2012) (citing *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118-19 (7th Cir. 1995) (rejecting the notion that because a police officer was acting solely to serve the interest of a private entity and not his government employer, he could not have acted under color of state law)).

Even assuming for the purposes of argument that the Plaintiff did in fact concede that the officers were acting within the scope of their employment, the facts raised in the Plaintiff's Complaint outlines actions by the Defendants that are criminal, malicious, willful or wanton, and/or calculated to benefit the employee personally. The Defendants hit, kneed, and tased an individual that was not actively resisting and did not have any weapons multiple times (Toney Depo. p. 37:12-15; 38:11-13; 39:25; 40:1-7; 40:20-25; 41:1-3; 43:6-13; 44:4-6; 88:12-24; 91:1-4; Ex. G, p. 2; Scholp Depo. p. 97:3-13; 98:3-11; 100:10-24 Campbell Depo. p. 35:18-23; 36:19-20; 27:13-20; 39:6-9). By removing the Mr. Scholp's cane from him and using so much force against him, the Defendants acted in a criminal, willful, wanton, and/or malicious way. Accordingly, the Plaintiff's alternative claims are appropriately stated against the Defendants and are not barred by the Indiana Tort Claims Act.

**6. Plaintiff's Assault and Battery claims do not fail as a matter of law.**

The Plaintiff's Complaint raised facially plausible assault and battery claims that allowed the Court and the Defendants to draw a reasonable inference that the Defendants are liable for their unlawful conduct. *See Lodholtz,* 778 F.3d at 639 (quoting *Ashcroft,* 556 U.S. at 678 (2009)). Specifically, the Factual Background of the Plaintiff's Complaint outlines the Defendants' uses of force, including the undisputed fact that, "Officer Toney took Plaintiff's cane from his

person…Officers Toney and Campbell administered repeated physical strikes to the Plaintiff, including knee and fist strikes…Officers Toney and/or Campbell tased Plaintiff approximately three times." (D.E. 1-1, p. 3). In the Plaintiff's Legal Claims section, the Plaintiff clearly identifies an assault and battery claim, asserts that the Defendants' actions were illegal and unlawful. (D.E. 1-1, p. 8-9). As a result, the Defendants had sufficient notice that the Plaintiff was raising an assault and battery claim as well as the acts the Plaintiff asserts form the basis for those claims.

Pursuant to Indiana Code § 35-41-3-3(b), "[a] law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to effect a lawful arrest." The Indiana Supreme Court has held that, "a law enforcement officer's use of force in excess of the reasonable force authorized by statute is not shielded from liability…" *Wilson v. Isaacs*, 929 N.E.2d 200, 201-02 (Ind. 2010). "Indiana's excessive force standard effectively parallels the federal standard." *See Thompson v. City of Indianapolis*, 208 F.Supp.3d 968, 977 (S.D. Ind. Sept. 22, 2016). Here the Defendants' uses of force against the Plaintiff were not reasonable and they are liable for battery.

The Plaintiff incorporates by reference his argument related to Defendants' excessive force above. In that argument, the Plaintiff demonstrates that there are indeed genuine issues of material fact concerning whether the Officers used excessive force. A reasonable jury could conclude that the Defendants' actions constituted battery pursuant to Indaina law. As a result, in the light most favorable to the Plaintiff, the Defendants are liable for battery.

7. **Plaintiff's claims for Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Negligence do not fail as a matter of law.**

The Plaintiff's Complaint raised facially plausible claims for Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Negligence that allowed the Court and the Defendants to draw a reasonable inference that the Defendants are liable for their

unlawful conduct.  *See Lodholtz,* 778 F.3d at 639 (quoting *Ashcroft,* 556 U.S. at 678).  Specifically, the Factual Background of the Plaintiff's Complaint outlines the Defendants' not only the Defendants' uses of force, but also the Defendants' other interactions prior to their uses of force (D.E. 1-1, p. 2-3).  In the Plaintiff's Legal Claims section, the Plaintiff clearly identifies claims for Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Negligence (D.E. 1-1, p. 9-11).  On his Intentional Infliction of Emotional Distress and Negligence claims, the Plaintiff clearly asserts that the Defendants' actions caused him compensable harm. (D.E. 1-1, p. 9, 11).  As a result, the Defendants had sufficient notice that the Plaintiff was raising claims for Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Negligence as well as the acts the Plaintiff asserts form the basis for those claims.

The Defendants' incorrectly assert that the Plaintiff's claims are based on the same use of force supporting the Plaintiff's state law claims of assault and battery and are therefore duplicative (D.E. 49, p. 30).  The Plaintiff outlines other facts in his Factual Background and, on summary judgment, the Plaintiff has produced evidence that supports those outlined facts.  The Defendants' interactions prior to using force against the Plaintiff, like taking his cane and yelling five orders in the span of six seconds that conflict with previously issued orders at the Plaintiff support the Plaintiff's state law tort claims.  Further, the Defendants' actions after the Plaintiff was handcuffed, like calling the Plaintiff a "crippled ass old man," placing his significant other in handcuffs for speaking onis behalf, and searching his vehicle without a warrant also support the Plaintiff's state law tort claims.   As a result of the Defendants' criminal, willful, wanton, and/or malicious acts, the Defendants' are liable for the Plaintiff's properly raised state law tort claims, which are not barred by the Indiana Tort Claims Act.

### 8. City of Evansville is liable for the violation of the Plaintiff's constitutional rights.

To establish a *Monell* claim a plaintiff must show that a constitutional violation resulted from "'(1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority'" *Campbell v. Miller,* 499 F.3d 711, 720 (7th Cir. 2007). *See also Montano v. City of Chicago,* 535 F.3d 558, 570 (7th Cir. 2008). There is no bright-line rule defining "widespread custom or practice." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010). Further, there is no clear consensus on the frequency on conduct required to impose *Monell* liability, only that there must be more than one instance. *Id.* A widespread custom or practice may take the form of an implicit policy, a gap in expressed policy, or "a series of violations to lay the premise of deliberate indifference." *Id.* Outside those threshold issues, "the jury must make a factual determination as to whether the evidence demonstrates that the County had a widespread practice that the alleged constitutional harm." *Id.* (citing *Woodward v. Corr. Med. Serv. of Ill., Inc.,* 368 F.3d 917, 928 (7th Cir. 2004)). As argued above, the Defendants violated the Plaintiff's rights under the First and Fourth Amendments.

Further, there is a widespread policy in the Evansville Police Department that causes and condones the violation of arrestee's constitutional rights. In the matter of *Wilson v. City of Evansville et al.*, filed under cause number 3:13-cv-00001, Mr. Wilson alleged that on or about April 17, 2014, two Evansville Police Department officers committed excessive force by hitting and/or striking him on his head, back, and shoulders and tasing him one of more times (Wilson Depo. p. 28:13-18; 29:24-25; 30:8-9; 33:7-16; 34:12-13; 35:2-4; 38:3-4; 38:7; 41:14-16; 44:10-12). Mr. Wilson also asserted that the Evansville Police Department officers made jokes about their body cameras not working (Wilson Depo. p. 89:18-22; 90:7-12). Additionally, in the matter

of *Milan v. City of Evansville et al.*, Louise Milan alleged that on or about June 21, 2012, EPD officers destroyed part of her property and used flash bang grenades in her home (Milan Depo. p. 7-10). Ms. Milan and her granddaughter were ordered on to the floor at gun point and handcuffed and their property was confiscated (Milan Depo. p. 7-10). In both circumstances, Evansville Police Department officers ignored facts as they developed and persisted in executing the arrest of and using excessive force against individuals in an objectively unreasonable manner.

Additionally, in this matter, the officers' attitudes and actions demonstrate the wide-spread practice of violating arrestee's rights. Specifically, after Mr. Scholp was handcuffed, both officers began to search Mr. Scholp's vehicle without a warrant (Officer Video 1, 6:30-6:40). While searching the vehicle, Officer Campbell said to Officer Toney, "why, dude? I don't fucking get it? I can't go two days without this bullshit" (Officer Video 1, 6:32-6:45). The officers then began laughing to each other and Officer Campbell said, "crippled ass old man...wouldn't give it up" (Officer Video 1, 6:45-7:00). While at deposition neither officer could recall what incident Officer Campbell was referencing, a reasonable jury could infer that Officer Campbell's statement is a reference to an incident similar to this matter occurring in the days prior to Mr. Scholp's arrest, where he used force against an individual that asserted his first amendment rights. Further, after Mr. Scholp was handcuffed, another officer came on-scene, and handcuffed Barbara asserting that, "you're not just going to sit there and yell at me about it, I can tell you that much right now." (Officer Video 2, 0:15-0:30). Barbara spent about five minutes in handcuffs before being released (Officer Video 2, 5:10-5:30).

Prior to the incident involving Mr. Scholp, the City of Evansville had notice of the widespread custom and practice of Evansville Police Department officers in using excessive force against non-resisting or passively resisting arrestees in at least two other cases. As a result, the

City of Evansville is liable for the violation of Mr. Scholp's constitutional rights, summary judgment should be denied, and this matter should be presented to a jury.

### Conclusion

The Plaintiff has presented a genuine issue of material fact with respect to the claims raised in his operative complaint. Moreover, Plaintiff's claims are not precluded as a matter of law. As such, the Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment, set this matter for trial, and grant them all just and proper relief.

Respectfully Submitted,

*/s/ Brooke Smith*
Brooke Smith, #32427-03
Scott L. Barnhart, #25474-82
Keffer Barnhart LLP

### CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of January, 2018, a copy of the foregoing **Memorandum** was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

*/s/ Brooke Smith*
Brooke Smith, #32427-03

Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana 46204
Smith@KBindy.com
T: (317) 857-0160